No. 39,422

STATE OF KANSAS, *Appellee,* v. CLAUDE PARKER, *Appellant.*

(276 P. 2d 317)

Opinion filed November 13, 1954.

*D. G. Smith,* of Girard, argued the cause, and *Jim Shaw,* of Galena, was with him on the briefs for the appellant.

*Laurance R. Mulliken,* County Attorney, argued the cause, and *Harold R. Fatzer,* Attorney General, and *William P. Meek,* Deputy County Attorney, were with him on the briefs for the appellee.

The opinion of the court was delivered by

PRICE, J.: The defendant was tried for the offense of murder in

the first degree in the killing of his son-in-law. He was convicted of the offense of manslaughter in the first degree (G. S. 1949, 21-407) and has appealed.

Defendant Claude Parker and his family were old-time residents of Galena. His family consisted of his wife, his son Earl and the latter's wife Mildred, and his daughter Marion who is the widow of Ernest Manning, the deceased.

Manning was originally from North Carolina, and he and Marion met and were married while he was stationed at a nearby army base during World War II.

Defendant had been a miner most of his life but had retired due to reasons of health. His wife and daughter Marion operated a variety store in Galena, and from time to time he and Manning assisted in its operation.

At this point it should be stated that the record before us consists of some 420 pages of the abstract and counter abstract. No attempt to summarize the evidence in detail will be made. As usually is the case in a matter of this kind, much of it is conflicting. On the other hand, considerable is undisputed. It is sufficient to say there is evidence in the record to substantiate that the following transpired on the fatal evening in question.

On the afternoon of July 14, 1953, defendant and his wife planned a family "fish supper" to be held at their home that evening. About five-thirty or six o'clock the family gathered. Those present were defendant, his wife, Earl and his wife, and Marion. The latter's husband, Ernest Manning (the deceased), had gone over to Joplin, Missouri, with his brother, and was not present.

Immediately following the meal Marion received a telephone call from a woman acquaintance and left with her to go to Joplin on an errand.

Shortly after her departure her husband, Manning, drove up and stopped in front of defendant's house. He hurried up to the front porch where the other members of the family were sitting and inquired as to Marion's whereabouts. Upon being told she was not there he replied, in an angry tone, "Oh yeah—that's what you say," or words to that effect, turned and rushed back toward his car.

Defendant, being of the opinion that Manning was intoxicated, left the porch and went into the house to call the police, so as to prevent Manning from driving while in that condition.

Just before reaching the sidewalk running in front of the house

Manning, apparently sensing what defendant was doing, turned and rushed back up to the porch and on into the hallway where defendant was using the telephone. He threatened defendant's life, struck and cursed him, and knocked the telephone from his hands. Defendant's son Earl, hearing the commotion, rushed to his father's assistance, and he and Manning went at it. In the ensuing struggle Earl's shirt was torn from him. He and Manning managed to get out on the front porch, at which place, as the result of a blow by Earl, Manning was knocked over the banister. Earl caught him in time to "break" the fall. The fracas between the two brothers-in-law continued in the front yard and apparently Earl was getting the better of it. Manning's glasses had been broken and his face and forehead were cut.

The evidence is not clear as to just what defendant had been doing during this brief interval. The state contends that he went into the west room of the house and picked up a revolver; while the defense contends that he obtained it from behind a picture on the telephone stand in the hall. In any event, he came out on the porch with a revolver in his hand, walked the length of the porch and down into the yard where Earl and Manning were still fighting.

In the yard was an ordinary and usual type bird bath. In it was a rock about the size of a doubled fist for birds to alight on while drinking or bathing. It then appears that during the skirmish, and amidst threats and cursing, Manning and defendant simultaneously reached for the rock. Defendant grabbed it with his right hand and upon his straightening up, the gun, which was in his left hand, was fired. There is evidence, although vigorously disputed, that in firing the gun defendant "reached around" Earl, who was between defendant and Manning. The bullet struck Manning in the left breast and he died almost instantly.

Officers were called and defendant was placed under arrest. That evening, and on other occasions, he was questioned about the homicide, and a number of persons who interviewed and questioned him testified at the trial concerning admissions and statements made by him.

Defendant and Manning had had trouble on a number of occasions, particularly when the latter had been drinking. Manning was not a "good drinker." There was substantial evidence to the effect he had been drinking on the afternoon and evening of his death. He was unarmed at the time.

Defendant was charged with murder in the first degree. Upon advice of counsel representing him, he waived a preliminary examination and was bound over for trial at the next term of court sitting at Galena (G. S. 1949, 20-1011a). He was denied the right to give bond. A few days later his motion to be permitted to bail pending trial was denied by the district court. The trial was commenced on November 30, 1953, and the jury returned its verdict, finding defendant guilty of manslaughter in the first degree, on December 7.

Defendant's motion for a new trial, containing eighteen grounds, was overruled. The verdict was approved, judgment was entered thereon and sentence pronounced. This appeal followed.

In this court defendant specifies eight grounds of alleged error in an effort to overthrow the verdict and judgment below. Each will be discussed.

First, it is contended the court erred in rejecting certain competent and material evidence offered by defendant. This ground, not being discussed or argued in his brief, must be considered as abandoned. Furthermore, the record does not disclose what evidence, if any, was rejected, and the point requires no further discussion.

Next, it is contended the court erred in admitting, over objection, evidence concerning matters entirely beyond the issues, and which was prejudicial to defendant. From the argument made, it appears that defendant has reference to matters pertaining to the family background and relationship of the parties, former incidents and troubles between them, and the general reputation of deceased for being a peaceable and law-abiding citizen. We do not propose to detail that evidence. We have studied the record carefully and in our opinion no error was committed in the reception of it. This is particularly true in view of the fact that the entire matter, including the homicide, was, in a sense, a "family affair."

It is contended the court erred in refusing to give certain requested instructions, and in the giving of certain of those that it did. Five of the requested instructions which were refused told the jury there was no evidence in the case which would justify submission of the question of guilt or innocence of murder in the first or second degree, or of manslaughter in the first, third and fourth degrees. Another instruction which was refused was a direction to the jury to render a verdict of not guilty. In addition to the foregoing, defendant submitted eighty-four alternative in-

structions, but complaint is made only of the refusal of the court to give seven of them. The substance of these instructions will not be detailed. We have read and studied them, together with the twenty instructions which were given.

The court instructed fully and completely on the law of justifiable homicide, excusable homicide, murder in the first and second degrees, and on manslaughter in each of the four degrees. These instructions covered such subjects as malice, intent and the presumptions in connection therewith, malice aforethought, wilfulness, deliberation, premeditation, self-defense, including the law of aggressor, circumstantial and direct evidence, the presumption of innocence, admissions and confessions, and reasonable doubt. As we read the record, the jury was fully and correctly instructed on every possible phase of the case warranted by the evidence. A specific objection to a portion of the instruction covering self-defense, in which it is claimed the jury was instructed that before defendant should be acquitted on the ground the killing was justifiable it must be found that he was *in fact* resisting an attempt on the part of deceased to kill him or commit a felony upon him, cannot be sustained. In the same instruction, the jury was quite properly told that defendant had the right to act upon honest belief and appearances at the time in question, even though the jury should find from the evidence that the danger was only apparent and did *not* exist *in fact*.

The rule is well established that error cannot be predicated on the refusal to give certain instructions where those which are given cover and include the substance of those which are refused. (*State v. Barnett,* 156 Kan. 746, 137 P. 2d 133.) See also Hatcher's Kansas Digest, Revised Edition, Criminal Law, § 306, for citation of numerous decisions following this rule.

The foregoing discussion, of course, concerns those instructions given to the jury prior to the submission of the case.

Defendant next complains of a supplemental instruction given after the jury had deliberated for several hours. It appears that during the course of the trial and in argument to the jury defendant and his counsel made much of the fact that defendant had been denied bail and had been held in jail from the date of the homicide until the time of trial. It already has been mentioned that he waived his statutory right to a preliminary examination. From the record it appears the denial of bail was based upon G. S. 1949, 62-

1206, which provides that all offenses are bailable except murder when the proof is evident or the presumption great, and that when one charged with murder voluntarily waives a preliminary examination such fact in and of itself concedes that the proof is evident or the presumption great. It further appears that in denying bail the court relied upon an early decision of this court found at *In re Malison, Petitioner,* 36 Kan. 725, 14 Pac. 144.

In any event, the record shows that after the jury had been deliberating for several hours it submitted the following question to the court:

"Can a man charged with first degree murder give bond? or could have Claude Parker given bond?"

In response to this question the court, in substance, instructed the jury that under the law one charged with murder in the first degree who waives his preliminary examination may not thereafter give bond, and that as defendant had waived his preliminary examination he had been denied bail.

Defendant contends this supplemental instruction was not only an erroneous statement of law but was highly prejudicial.

As we view the matter, the question of the correctness of the "instruction" is purely academic and does not call for a specific answer. We are of the opinion, however, that better practice would be for the court to have advised the jury that the question of defendant's right to have given bond was outside the issues of the case and was immaterial on the question of guilt or innocence of the offense charged. On the other hand, it does not follow that just because the jury was instructed on this extraneous matter prejudice thereby resulted. Defendant's contention with respect to this incident cannot be sustained.

And finally, it is argued the court erred in overruling defendant's demurrer to the state's evidence and motion for discharge, and his motion for a directed verdict of not guilty at the close of all of the evidence.

He also complains that the very fact the court instructed on the law of murder in the first and second degrees, when, it is claimed, there was an utter lack of evidence to support either charge, in and of itself tended to inflame the jury to his prejudice. We do not agree. Nowhere is the fact denied that the revolver was in defendant's hands when fired. We think the evidence in this case comes

clearly within what was said in the case of *The State v. Demming,* 79 Kan. 526, 100 Pac. 285:

"But the question whether under all the circumstances the defendant was justified in shooting him was clearly one for the determination of the jury. It can not be said that the admitted facts compelled an acquittal or that the evidence conclusively established that the killing was done in self-defense. . . . Whether at the moment the shot was fired he was following up the assault or was attempting to escape, and whether the assault was of such a character as to lead the defendant to a reasonable belief that he was in danger of serious injury and that the shooting was necessary for his protection, were matters about which opinions might reasonably differ." (p. 527.)

The court did not err in overruling defendant's motion for discharge at the conclusion of the state's evidence or in overruling his motion for a directed verdict of not guilty at the close of all of the evidence.

And lastly, it is contended the court erred in overruling defendant's motion for a new trial.

Much that already has been said applies to this contention. We have made a careful study and review of the entire record, and are convinced that defendant was accorded a fair trial. No error being shown, the judgment must be and is affirmed.